## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

SHEILA I. LAWSON *o/b/o* E.S.,  )    CASE NO. 1:14-CV-01541
                                )
      Plaintiff,               )
                                )
                                )    MAGISTRATE JUDGE
      v.                       )    VECCHIARELLI
                                )
CAROLYN W. COLVIN,              )
      Acting Commissioner of Social )
      Security,                )    **MEMORANDUM OPINION AND**
                                )    **ORDER**
      Defendant.               )

Plaintiff, Sheila I. Lawson ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's granddaughter, E.S. ("Claimant"), for Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the

Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before

the undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

### I.    PROCEDURAL HISTORY

On January 3, 2011, Plaintiff filed an application for SSI on behalf of Claimant,

alleging a disability onset date of August 1, 2009.  (Transcript ("Tr.") 10.)  The

application was denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On December 3, 2012, an ALJ

conducted a video hearing.  (*Id.*)  Plaintiff, Claimant's grandmother, appeared and

testified on behalf of Claimant.  (*Id.*)  Claimant was represented by an attorney.  (*Id.*)

On January 25, 2013, the ALJ found Claimant not disabled.  (Tr. 7.)  On May 27, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1-10.)

On July 14, 2014, Plaintiff filed a complaint on behalf of Claimant challenging the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 17, 18.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in evaluating the opinion of Claimant's treating psychiatrist; and (2) the ALJ erred in evaluating a report by Claimant's kindergarten teacher.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Claimant was born in August 2006 and was a preschooler on the date Plaintiff filed her application for SSI and is currently a school-age child.  (Tr. 13.)  Claimant had not engaged in substantial gainful activity since January 3, 2011, the application date.  (*Id.*)

### B.  Medical Evidence and School Reports

In December 2009, education specialists produced an evaluation team report regarding Claimant.  (Tr. 180-202.)  The team concluded that Claimant was a preschooler with a developmental dely due to documented deficits in communication, "social-emotional," and adaptive behavior.  (Tr. 201.)  She required specialized instruction and speech therapy.  (*Id.*)

In September 2010, Irwin B. Jacobs, M.D., a neurologist, examined Claimant due

2

to reports of marked hyperactivity.  (Tr. 399-400.)  Claimant was four-years-old at the time.  (Tr. 399.)  Claimant's grandmother ("Plaintiff" or "Ms. Lawson") stated that Claimant was not cooperative when dressing in the morning, resisted going to bed before 11 p.m., and hit other children.  (Tr. 399.)  Claimant was enrolled in North Ridgeville Early Childhood Learning Center due to her behavior and speech delay, although the speech delay had improved dramatically.  (*Id.*)

Dr. Jacobs noted that Claimant was hyperactive on examination, but became very cooperative when he focused on her.  (Tr. 399.)  Dr. Jacobs did not note any additional abnormalities.  (Tr. 400.)  He found no underlying structural abnormality of the brain that would explain the child's inattentiveness and marked impulsivity.  (Tr. 406.)  Dr. Jacobs stated that Claimant was too young for a diagnosis of attention deficit hyperactivity disorder (ADHD) but that her symptoms were consistent with it.  (Tr. 400.)  He further discussed the possibility that Claimant had bipolar disorder and oppositional defiant disorder and suggested that she take medication.  (*Id.*)

In December 2010, a team, which included Plaintiff and education specialists, created an Individualized Education Plan (IEP) for Claimant.  (Tr. 170-179.)  The report noted that Claimant sometimes had difficulty sharing and taking turns, but that she worked well with adults and children most of the time.  (Tr. 171.)  Claimant was able to sit and participate in large and small group settings.  (*Id.*)  She could adhere to a routine and follow multi-step directions with an occasional model or verbal reminder.  (*Id.*)  The report indicated that Claimant demonstrated significant growth and mastered all prior IEP goals pertaining to communication.  (Tr. 173.)  She demonstrated speech problems and had difficulty sharing and taking turns once a day.  (Tr. 173-174.)

3

In March 2011, Claimant underwent a psychiatric evaluation by psychiatrist Nora McNamara, M.D. (Tr. 425-430.)  Claimant's reported problems included hitting, not listening, and making hurtful statements.  (Tr. 425.)  Claimant was taking Adderall for ADHD and another medication, which is illegible in Dr. McNamara's treatment notes. (*Id.*)  On examination, Claimant was cooperative but had a depressed mood and constricted affect.  (Tr. 428.)  Dr. McNamara diagnosed mood disorder, not otherwise specified (NOS) and prescribed Risperdal for bipolar disorder.  (Tr. 429-430.)  She assessed Claimant with a Global Assessment of Functioning (GAF) score of 60.[1]  (Tr. 429.)

Dr. McNamara saw Claimant four time between April 2011 and August 2011. (Tr. 431-434, 451-452.)  In April 2011, Dr. McNamara noted that Claimant had a much improved temper and ability to sleep.  (Tr. 431.)  In May 2011, Dr. McNamara noted that Claimant's mood had improved.  (Tr. 433.)  In August 2011, Dr. McNamara's impression included mood disorder (NOS) and post-traumatic stress disorder (PTSD). (Tr. 451.)  Dr. McNamara noted that Claimant's aggression was well-controlled and that her anxiety symptoms predominated.  (*Id.*)  A medication was added, but it is illegible. (*Id.*)

Another IEP was created in April 2011.  (Tr. 286.)  The report indicated that

---

[1]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.

4

Claimant may not require intervention services with respect to pre-academic skills.  (Tr. 287.)  She had many good rote skills, but difficulty with abstract concepts, problem solving, and applying those skills.  (Tr. 287.)  Claimant was not able to take turns without direct involvement of an adult.  (*Id.*)  At least once a day, she was "sneakily aggressive to other children."  (*Id.*)  Claimant had at least some difficulty following directions and communicating when upset.  (*Id.*)  Limited attention and distractibility significantly impacted Claimant's performance on structured tasks.  (*Id.*)  The report indicated that she had difficulty sharing, waiting her turn, and keeping her hands to herself in group situations.  (Tr. 290.)

In September 2011, Dr. McNamara completed a form supplied by Claimant's attorney concerning Claimant's mental limitations.  (Tr. 454-455.)  Dr. McNamara opined that Claimant had no limitations in: acquiring and using information; moving about and manipulating objects; and health and physical well-being.  (*Id.*)  She also opined that Claimant had moderate limitations in: attending and completing tasks; interacting and relating to others; and caring for herself.  (Tr. 454.)

Claimant returned to Dr. McNamara in February 2012.  Dr. McNamara reported that Claimant's medication helped significantly with sleep, but that her teachers reported problems with anxiety and hyperactivity.  (Tr. 475.)  Claimant was getting along better at school.  (*Id.*)  On examination, she was pleasant and cooperative, and Dr. McNamara recommended occupational therapy.  (*Id.*)

Later that month, a team created another IEP for Claimant.  (Tr. 321-329.)  She was in kindergarten at the time.  (Tr. 323.)  Claimant interacted with her peers

5

appropriately, but was often more concerned with what they were doing as opposed to what she should be doing.  (*Id.*)  She appropriately attended group instruction and completed assignments independently some of the time.  (*Id.*)  Claimant sought constant approval and attention from her teachers.  (*Id.*)

In March 2012, Eileen Zakel, Claimant's teacher, completed an assessment regarding Claimant's limitations.  (Tr. 343-350.)  In the domain of acquiring and using information, Ms. Zakel opined that Claimant had obvious to very serious problems in: comprehending oral instructions; understanding school and content vocabulary; and comprehending and doing math problems.  (Tr. 344.)  She reported that Claimant was very distractible and impulsive, sought attention, and had difficulty sitting and completing work without getting up to talk to a teacher or get a tissue.  (*Id.*)  She was preoccupied with what others students were doing.  (*Id.*)

In the domain of attending and completing tasks, Ms. Zakel stated that Claimant had serious or very serious problems on a daily basis in: focusing to complete a task; refocusing; carrying out multi-step directions; organizing materials; completing homework assignments; completing work accurately without careless mistakes; and working without distracting herself or others.  (Tr. 345.)  In response to a request for a narrative explanation, Ms. Zakel repeated what she said with respect to the domain of acquiring and using information.  (*Id.*)  In the domain of interacting and relating with others, Ms. Zakel indicated that Claimant had a very serious problem seeking attention appropriately.  (Tr. 346.)  Ms. Zakel explained that Claimant needed a great deal of attention to complete school work.  (*Id.*)

6

In the domain of moving about and manipulating objects, Ms. Zakel reported that Claimant had obvious problems with managing the pace of physical activities or tasks and a serious problem in integrating sensory output with motor output.  (Tr. 347.)  She stated that Claimant used sensory equipment to help control her movements, especially with respect to fine motor tasks.  (*Id.*)  In the domain of caring for herself, Ms. Zakel opined that Claimant had serious or very serious problems in: being patient; personal hygiene; caring for physical needs; responding appropriately to changes in her own needs; using appropriate coping skills to meet daily demands of the school environment; and knowing when to ask for help.  (Tr. 348.)  Ms. Zakel stated that Claimant had not been bathing enough and needed help snapping her clothes.  (*Id.*)  She reported that Claimant's impulsivity and hyperactivity affected her school work and her ability to attend for long durations.  (*Id.*)

On March 7, 2012, Mark Boyle, an occupational therapist, evaluated Claimant for reported sensory problems.  (Tr. 463.)  Plaintiff reported that Claimant was hypersensitive to touch and certain fabrics; took excessive risks when playing; and engaged in movement activities like spinning, which interfered with her daily routine.  (Tr. 464.)  Mr. Boyle diagnosed a lack of coordination and recommended a deep pressure touch program, "brain gym," and sensory processing activities.  (Tr. 465.)  Claimant attended numerous occupational therapy sessions between March and August 2012 due to problems with pencil grasping, fine motor coordination, and sensory processing.  (Tr. 468-510.)

In April 2012, Claimant presented to Dr. McNamara, who noted that her sleep was okay.  (Tr. 474.)  Claimant was pleasant and cooperative and was prescribed

7

Ritalin for ADHD.  (*Id.*)  In May 2012, Claimant returned to Dr. McNamara, and reports indicate that Claimant was much better while taking Ritalin but that the medication wore off by three o'clock in the afternoon.  (Tr. 482.)  Dr. McNamara noted that Claimant was pleasant on examination and managed her dosage of Ritalin.  (*Id.*)  In early June 2012, Dr. McNamara reported that Claimant was "doing really really well."  (Tr. 481.)  Claimant was pleasant and cooperative.  (*Id.*)  In late June 2012, Dr. McNamara reported that Claimant was irritable and very disruptive.  (Tr. 480.)  Dr. McNamara prescribed Abilify for depression and bipolar disorder.  (*Id.*)

In June 2012, Claimant's school provided a report card.  (Tr. 357-362.)  The report card stated that Claimant showed improvement in large and small group discussion settings since beginning medications, and she was making adequate progress in following classroom routines.  (Tr. 361.)  It also indicated that Claimant improved in showing respect to others, participating in group activities, working without disturbing others, and obeying rules.  (Tr. 358.)

In July 2012, Claimant's mood was improved.  (Tr. 470.)  Dr. McNamara noted that one of Claimant's symptoms was not "where we'd like it," but the remainder of the note is illegible.  (*Id.*)  Dr. McNamara noted that Claimant was pleasant and cooperative and she increased Claimant's Abilify.  (*Id.*)  In August 2012, Dr. McNamara reported that Claimant was doing well with respect to her mood and sleep and she was pleasant and cooperative.  (Tr. 478.)  Claimant returned to Dr. McNamara in September 2012. (Tr. 477.)  Although Dr. McNamara's notes are not entirely legible, it appears that she discontinued Claimant's Ritalin due to aggressive and explosive behavior and

8

prescribed a new medication.  (*Id.*)

In October 2012, Dr. McNamara completed a second medical source statement. (Tr. 484.)  She noted that Claimant had the following symptoms before, but not after, medication: inattention; impulsiveness; hyperactivity; emotional lability; irritability; and signs of tactile "overloading."  (*Id.*)  She opined that Claimant had mild impairment in age-appropriate personal functioning and marked impairment in the following areas: age-appropriate cognitive/communicative functioning; age-appropriate social functioning; and maintaining concentration, persistence, or pace.  (*Id.*)  When asked to explain any marked limitations and include the medical/clinical findings that supported her assessment, Dr. McNamara wrote "see record."  (*Id.*)

### C.    State Agency Reports

In March 2011, speech language pathologist Lisa Lynch, M.A., C.C.C./S.L.P., psychologist John Waddell, Ph.D., and pediatrician Louis Goorey, M.D., opined that Claimant had less than marked limitations in the four domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.  (Tr. 77-78.)  The state agency professionals opined that Claimant had no limitations in the two domains of moving about and manipulation of objects and health and physical well-being.  (Tr. 78-79.)

### D.    Plaintiff's Hearing Testimony

Plaintiff testified at Claimant's administrative hearing.  She stated that she has cared for Claimant since she was born and has had full custody of her since she was two-years-old.  (Tr. 50.)  Plaintiff first noticed unusual behavior when Claimant was three-years-old and would hit Plaintiff.  (*Id.*)  Claimant's pediatrician, Dr. Jesse,

9

recommended that Claimant see a psychiatrist because of the way she treated her grandmother and because of the way she yelled and screamed while visiting Dr. Jesse's office.  (Tr. 51.)

Claimant began seeing a psychiatrist, Dr. McNamara, at the age of four for counseling and medication.  (Tr. 52-53.)  Dr. McNamara tried several different medications for ADHD and anger.  (Tr. 53.)  Plaintiff stated that Claimant's behavior was out of control, and that Claimant hit her and yelled at her and other family members.  (Tr. 54-55.)  Plaintiff testified that Claimant was doing better in school than she was the previous year.  (Tr. 55.)  Plaintiff stated: "[T]his year, she's doing okay. They say she's doing better than last year.  Her ADHD is doing good with the medication.  She's not been hitting nobody at school.  She's been getting along with everybody at school."  (*Id.*)  Plaintiff further testified that Claimant's medication has not helped to improve Claimant's behavior at home.  (*Id.*)

Plaintiff testified that she did not take Claimant shopping often because Claimant behaved badly in stores.  (Tr. 59.)  Plaintiff stated that Claimant could sit for 10 minutes. (*Id.*)  Plaintiff let Claimant dress herself because, due to Claimant's sensory disorder, if clothes did not feel right on her body Claimant would not wear them.  (Tr. 59-60.) Claimant participated in occupational therapy for her sensory disorder.  (Tr. 61.) Plaintiff testified that some of the work Claimant did in school was good and some was bad.  (Tr. 67.)  Plaintiff described Claimant as a "very smart girl."  (*Id.*)

### III.   STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if she has a medically determinable physical or mental impairment which results in marked and

severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and

11

manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant was born in August 2006. Therefore, she was a preschooler on January 3, 2011, the date the application was filed, and is currently a school-age child.

2.   The claimant has not engaged in substantial gainful activity since January 3, 2011, the application date.

3.   The claimant has the following severe impairments: attention deficit hyperactivity disorder; mood disorder; posttraumatic stress disorder; oppositional defiant disorder, a motor incoordination and sensory disorder; and bipolar affective disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.

6.   The claimant has not been disabled, as defined in the Social Security Act, since January 3, 2011, the date the application was filed.

(Tr. 13-34.)

## V.  LAW & ANALYSIS

A.    **Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

B.    **Plaintiff's Assignments of Error**

1.    **The ALJ Erred in Evaluating the Opinion of Claimant's Treating Psychiatrist.**

In October 2012, Dr. McNamara, Claimant's treating psychiatrist, opined that Claimant had marked limitations in age-appropriate cognitive/communicative functioning; age-appropriate social functioning; and in her ability to maintain

13

concentration, persistence, or pace.  (Tr. 484.)  The ALJ assigned "little weight" to this

opinion, explaining:

> This opinion was disproportionate to the underlying record as a
> whole.  Specifically, Dr. McNamara had cited only moderate
> deficits in attention and interaction in 2011.  (Ex. 8f/1)
> Moreover, she had noted improved mood, temper and sleep
> with medication and less aggression. (Exs. 5F/7, 9 and 7F/2)
> Further, the claimant's June 2012 school progress reports had
> noted improvements in attention and social domains with
> medication. (Ex. 19E/2, 5)  In addition, Dr. McNamara noted
> that the claimant's attention deficit hyperactivity disorder
> symptoms resolved with medication. (Ex. 14F/2)  In sum, Dr.
> McNamara's 2012 opinion was grossly inconsistent with the
> record as a whole, including her own previous observations.

(Tr. 31.)  Plaintiff argues that the ALJ erred in assigning Dr. McNamara's opinion less

than controlling weight, as he failed to adequately explain his reasons for doing so.

Plaintiff further maintains that if controlling weight was afforded to Dr. McNamara's

opinion, Claimant would have marked limitations in three of the four domains:

"Acquiring and Using Information ('cognitive/communicative functioning'), Attending and

Completing Tasks ('maintaining concentration, persistence, or pace'), and Interacting

and Relating with Others ('social functioning')."  (Plaintiff's Brief ("Pl.'s Br.") at 14.)  For

the following reasons, Plaintiff's argument is not well taken.

   "An ALJ must give the opinion of a treating source controlling weight if he finds

the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic

techniques' and 'not inconsistent with the other substantial evidence in the case

record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20

C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating

source's opinion less than controlling weight, he must give "good reasons" for doing so

that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, the ALJ provided "good reasons" for assigning less than controlling weight to Dr. McNamara's October 2012 opinion, and substantial evidence in the record supports that conclusion.  Plaintiff maintains that the ALJ's statement that Dr. McNamara's opinion conflicted with the record as a whole was legally insufficient to support the ALJ's decision to assign the opinion little weight.  As the Commissioner notes in her Brief, however, the ALJ's summary statement that Dr. McNamara's opinion was inconsistent with the record as a whole was accompanied by specific reasons for discounting the opinion.  (Tr. 31.)  Rather than dismissing Dr. McNamara's October 2012 opinion without discussion, the ALJ explained that the opinion was entitled to "little weight" because it conflicted with: findings in Dr. McNamara's 2011 opinion; treatment notes demonstrating improvement in Claimant's condition; and a June 2012 progress report.  (Tr. 31.)  Additionally, the ALJ found that Dr. McNamara's October 2012 opinion that Claimant had marked limitations in three areas conflicted with other findings within that same opinion which suggested that Claimant's symptoms resolved

15

with medication.  (*Id.*)

As the ALJ notes in his decision, Dr. McNamara's October 2012 opinion conflicts with an opinion she issued about one year earlier.  In September 2011, Dr. McNamara opined that Claimant had no limitations in: acquiring and using information; moving about and manipulating objects; and health and physical well-being.  (Tr. 454.)  She opined that Claimant had moderate limitations in: attending and completing tasks; interacting and relating to others; and caring for herself.  (*Id.*)  In contrast, Dr. McNamara opined in October 2012 that Claimant had marked limitations in age appropriate cognitive/communicative and social functioning and maintaining concentration, persistence, or pace.  (Tr. 484.)  Plaintiff argues that it was inappropriate for the ALJ to compare Dr. McNamara's 2011 opinion to her 2012 opinion, because Claimant's condition worsened between 2011 and 2012 and because Dr. McNamara knew Claimant better in 2012.   A review of the ALJ's lengthy hearing decision shows, however, that the ALJ assessed the evidence of record and determined that Claimant's condition did not significantly worsen since 2011, but rather improved with treatment.  (Tr. 32.)  Substantial evidence supports this finding.  For example, in April 2011, Dr. McNamara noted that Claimant had a much improved temper and ability to sleep.  (Tr. 431.)  In May 2011, Dr. McNamara found that Claimant had an improved mood.  (Tr. 433.) The following month, Dr. McNamara reported that Claimant had improved sleep and decreased aggression.  (Tr. 452.)  Additionally, Dr. McNamara observed in August 2011 and April 2012 that Claimant was pleasant and cooperative.  (Tr. 19, 451, 474.)

Plaintiff maintains that the ALJ "cherry-picked" the record in concluding that Claimant's condition improved since 2011.  (Pl.'s Br. 16.)  Plaintiff notes that at

appointments with Dr. McNamara between September 2011 and October 2012, Claimant had varying responses to her medications and had increased aggressiveness, anxiety, and hyperactivity at times.  (Pl's Br. 17.)  While Plaintiff presents evidence from Dr. McNamara to support her claim that Dr. McNamara's 2012 opinion should be entitled to controlling weight due to its consistency with the record, this is not the appropriate standard to apply to the ALJ's decision.  An ALJ's decision that is supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.  As substantial evidence supports the ALJ's assessment of Dr. McNamara's opinion, the Court declines to engage in a re-weighing of the evidence.

Furthermore, the ALJ relied on evidence of Claimant's June 2012 school progress report to find that Claimant was not as limited as Dr. McNamara opined.  (Tr. 31, 357-362.)  The progress report stated that Claimant showed improvement in large and small group discussion settings since beginning medications, and she was making adequate progress in following classroom routines.  (Tr. 361.)  It also indicated that Claimant improved in showing respect to others, participating in group activities, working without disturbing others, and obeying rules.  (Tr. 358.)

Finally, the ALJ explained that he discounted Dr. McNamara's October 2012 opinion that Claimant was markedly limited in three areas because it conflicted with Dr. McNamara's conclusion that Claimant's ADHD symptoms resolved with medication.  (Tr. 31.)  Indeed, in her October 2012 opinion, where Dr. McNamara opined that Claimant had marked limitations in three different areas, Dr. McNamara also opined that Claimant had the following medically-documented findings *pre-medication*:

17

inattention; impulsiveness; hyperactivity; emotional lability; irritability; and signs of tactile "overloading." (Tr. 484.)  Notably, Dr. McNamara reported that none of those conditions existed *post-medication*.  (*Id.*)  Thus, as the ALJ observes in his opinion, Dr. McNamara opined in October 2012 that Claimant's ADHD symptoms resolved with medication.  (Tr. 31.)  This is inconsistent with her opinion that Claimant was markedly limited in cognitive/communicative functioning, social functioning, and the ability to maintain concentration, persistence, or pace.

The Court finds no basis to conclude that the ALJ's decision to assign "little weight" to Dr. McNamara's October 2012 opinion lacks the support of substantial evidence, as the ALJ provided "good reasons" for discounting the opinion.  Accordingly, Plaintiff's first assignment of error does not present a basis for remand.

### 2.  The ALJ Erred in Evaluating a Report by Claimant's Kindergarten Teacher.

Plaintiff argues that the ALJ erred in evaluating the March 2012 opinion of Claimant's kindergarten teacher, Intervention Specialist Eileen Zakel.  Ms. Zakel opined that Claimant had "serious" and "very serious" problems in several different areas of functioning.  (Tr. 343-350.)  The ALJ assigned "little weight" to Ms. Zakel's opinion, as it "placed too much emphasis on attention-deficits and was disproportionate to the record as a whole." (Tr. 33.)  The ALJ explained:

> In this report, the claimant's teacher noted that the child was very distractible and impulsive, had difficulty sitting to complete work, needed hygiene guidance, sought attention inappropriately and required sensory equipment to help her with her movements, especially her fine motor tasks.  (Ex. 17E) Overall, while citing a range of slight to serious deficits in nearly all domains, it appeared that the teacher had actually assessed the claimant's

18

attention deficits over and over again.  Viewing the teacher's narrative as a whole, the general theme appeared to be ongoing attention deficits.  Still, the undersigned found nothing so extreme as to suggest marked deficits in functioning.  Moreover, the claimant's June 2012 report was generally good noting improvement in group and individual work with medication and success in the development of social skills.  (Ex. 19E/2, 5)  Overall, the March 2012 school update appeared to overemphasize the claimant's attention deficits.  Further, previous reports had suggested symptoms consistent with moderate deficits and a subsequent report had stated improvement with medication.  (Exs. 1E; 8E; 16E and 19E) Thus, this report was discounted in favor of other reports more consistent with the evidence as a whole.

(Tr. 33.)  According to Plaintiff, the ALJ made several errors of law in evaluating Ms. Zakel's opinion.  For the following reasons, Plaintiff's argument is without merit.

Social Security Ruling 06-3p explains that opinions and other evidence from educational personnel are relevant to the ALJ's determination of a claimant's RFC:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03P, *6 (S.S.A Aug. 9, 2006).  Furthermore, Social Security Ruling 06-3p provides that when evaluating opinion evidence from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity,

19

certain factors should be considered,[2] such as:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

*Id.* at *4-5.

Here, the Court finds no error in the ALJ's analysis of Ms. Zakel's report, as the Court is satisfied that the ALJ adequately considered it in determining whether Claimant was disabled.  The ALJ explained that he discounted Ms. Zakel's report because it conflicted with other school reports and appeared to reassess Claimant's attention deficits repeatedly.  (Tr. 33.)  As the ALJ observed, Ms. Zakel's report assessing debilitating problems was inconsistent with previous school reports indicating moderate impairments and a subsequent school report stating that Claimant improved with medication.  (*Id.*)  For example, a February 2012 IEP report noted that Claimant appropriately attended group instruction and completed assignments independently some of the time.  (Tr. 323.)  Ms. Zakel, in contrast, reported that Claimant had serious or very serious deficits in areas relating to attending and completing tasks on a daily basis.  (Tr. 345.)  Ms. Zakel's report was also inconsistent with Claimant's June 2012 report card, which stated that Claimant showed improvement in large and small group

---

[2]     Not every factor for weighing evidence will apply in every case.  SSR 06-03P, *5 (S.S.A. Aug. 9, 2006).

instruction settings since beginning medications and was making adequate progress in following classroom routines.  (Tr. 361.)  It further indicated that Claimant improved in showing respect to others, participating in group activities, working without disturbing others, and obeying rules.  (Tr. 358.)

Additionally, Ms. Zakel's report conflicted with the opinions of five state agency examiners, all of whom opined that Claimant had less than marked limitations in all areas aside from moving and manipulating objects and health and physical well-being, both of which received no limitation.  (Tr. 74-78, 83-89.)  The ALJ assigned significant weight to those opinions, finding that they were generally consistent with the record as a whole.  (Tr. 30.)

The ALJ's discussion of the medical evidence was not merely a rote recitation of Claimant's longitudinal history; rather, the ALJ analyzed the medical evidence, agency assessments, and school reports and explained how that evidence supported his conclusion that Claimant is not disabled.  (Tr. 13-34.)  In assessing the degree of Claimant's limitations, the ALJ gave proper consideration to Ms. Zakel's March 2012 report and offered a rather detailed explanation for why he assigned the opinion little weight.  As Ms. Zakel was not one of Claimant's treating sources, the ALJ was not required to give any more deference to her opinion than he did in his decision.  Plaintiff has failed to show that the ALJ's treatment of Ms. Zakel's opinion constitutes reversible error.  Accordingly, Plaintiff's second assignment of error does not present a basis for remand of Claimant's case.

21

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*

U.S. Magistrate Judge

Date: June 15, 2015